**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY JO MANNIX, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-5422 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| DENTAL EXPERTS, LLC d/b/a | ) | |
| DENTAL DREAMS LLC, and KOS | ) | |
| SERVICES LLC, | ) | |
| | ) | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

Currently before the Court is Defendants' motion for summary judgment [82] on all counts in Plaintiff's amended complaint [44]. For the reasons set forth below, the Court grants the motion [82] and will enter judgment in favor of both Defendants and against Plaintiff on all counts. Civil case terminated.

**I.    Background**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements of undisputed material facts and supporting exhibits: [84, 92, 93, 96, 102.][1] The Court construes the facts in the light most favorable to the nonmoving party—here, Plaintiff. The following facts are undisputed unless otherwise noted. "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does

---

[1] Defendants' reply requested that the Court disregard certain of Plaintiff's Local Rule 56.1 statements and responses on the grounds that they are, respectively, insufficiently concise and improper argumentative denials. Regarding the former, both parties' statements include lengthy recitations that arguably violate Local Rule 56.1(a)'s brevity requirement. Regardless, the Court will exercise its discretion in the direction of leniency and consider the submissions. *E.g.*, *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013). As to the latter, the Court addresses disputes as needed with regard to each allegedly disputed fact.

not show that the fact is in genuine dispute." *King v. Chapman*, 2013 WL 6709623, at *3 (N.D. Ill. Dec. 16, 2013).

Defendants Dental Experts, LLC d/b/a Dental Dreams and KOS Services, LLC ("Defendants") hired Plaintiff Mary Jo Mannix ("Plaintiff") as an accountant in 2007.[2] [91, ¶ 1.] She was hired at the age of 56 by Defendants' CEO, Peter Stathakis ("Stathakis"). [*Id.*] Her direct supervisor was Brian MacKinnon ("MacKinnon"), Defendants' Corporate Controller. [102, ¶¶ 2, 23.] The Employee Handbook required all employees to be regular and punctual in their attendance; according to the Handbook, employees who were routinely tardy or absent are subject to disciplinary action up to and including dismissal. [*Id.*, ¶ 12.] According to Defendants, at least some aspects of an accountant's job require in-person attendance. [102, ¶ 40] Regardless, the Handbook also explained that employment was "at-will." [*Id.*, ¶ 13.] During her early tenure with Defendants, she regularly worked sixty-hour weeks and received five-figure bonuses, presumably in appreciation of her hard work. [102, ¶ 5.]

In 2015, Plaintiff began to experience health problems, and had to take time off work. [*Id.*, ¶ 5.] She quickly exceeded her thirteen days of paid time off (PTO), but Defendants continued to pay her for some of the missed days nonetheless. [*Id.*]; [93, ¶ 18 (Plaintiff missed 115 days of work, and was paid for about half of them)].[3] On days Plaintiff felt too unwell to come to the

---

[2] The parties dispute whether Plaintiff was employed by both entities or just KOS. Because Defendants' motion for summary judgment on this ground is spare, see [83 at 15], and Defendants are entitled to summary judgment anyway, the Court assumes (without deciding) that Plaintiff was employed by both.

[3] Plaintiff disputes the admissibility of Defendants' Excel spreadsheets of Plaintiff's time records as hearsay. She argues that they are inadmissible as business records because Defendants' Rule 30(b)(6) witness, who had been asked to testify about "[Plaintiff's] attendance record," could not personally authenticate them. Instead, Defendants point to the affidavit of Plaintiff's direct supervisor, MacKinnon, who declared that he maintained the spreadsheet as a contemporaneous record of each of his employees' attendance in order to track their PTO and time off. [84-2 at 262, ¶ 3.] Plaintiff does not cite any case law indicating that Rule 30(b)(6) requires the deponent to be able to personally authenticate every business record, nor does she otherwise explain why MacKinnon's declaration is insufficient to authenticate the timesheets as records of a regularly conducted activity. See FRE 803(6). In any event, she concedes that

2

office, she completed work from home as much as possible, including responding to e-mail questions from Stathakis and MacKinnon and requesting information and documents from MacKinnon for the purpose of completing work from home. [102, ¶ 5.] The parties dispute whether Plaintiff was paid for her missed days in recognition of her hard work or because Stathakis was concerned about her health. [93, ¶ 20]; [102, ¶ 6.] They do not dispute, however, that Stathakis was concerned about her health and encouraged her to take care of herself. [93, ¶ 20.]

Plaintiff was diagnosed with colon and rectal cancer in February 2016. [102, ¶ 7.] In mid-March, she requested a leave of absence, which was granted on March 17, 2016. [*Id.*] By then, Plaintiff had already been out of the office for 28.5 days, for which she had been fully compensated. [93, ¶ 26.] Plaintiff then took 12 weeks of leave pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA") from March 21, 2016 through June 21, 2016.[4] [93, ¶ 24.] Defendants paid Plaintiff her entire salary during the full twelve weeks that Plaintiff was off work on FMLA leave. [*Id.*] Plaintiff underwent chemotherapy and radiation from late March 2016 to late April 2016. [102, ¶ 8.] Between her cancer and its treatment, Plaintiff experienced nausea, diarrhea, dehydration, weakness, fatigue, stomach upset, blood in the stool, pain, and weight loss. [102, ¶¶ 6–8.] Notwithstanding her discomfort and fatigue, Plaintiff did at least a little work from home most days. [*Id.*, ¶ 9.] She estimates that she averaged ten to twelve hours of work per week. [102, ¶ 14.]

---

she missed a lot of time. [93, ¶¶ 17–19, 28, 47]; [92-2 at 9 ("Q: And so in 2016, according to records, you were off for a total of a hundred and forty-one and a half days. Does that sound right to you? A: It sounds reasonable.")]

[4] By way of background, "[t]he Family and Medical Leave Act of 1993 * * * entitles eligible employees to take up to 12 work weeks of *unpaid* leave annually for any of several reasons, including the onset of a 'serious health condition' * * *." *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 724 (2003) (emphasis added).

The parties do not dispute that Stathakis was exceptionally supportive of Plaintiff during her diagnosis and decision to take leave. [102, ¶ 7.] They do dispute, however, how far his reassurances went. Plaintiff maintains that Stathakis told her to take as much time to recover her health as necessary, and promised that Defendants would pay her regular salary to her through the end of 2016. [*Id.*] Defendants counter that Stathakis only promised to gratuitously pay her salary until she returned to work. [*Id.*][5]

The record is not entirely clear, but it appears as though Plaintiff repeatedly miscalculated how long her convalescence would take. She apparently tried to return to work in May, but was still too exhausted from the radiation. [92-1 at 187.] She ultimately was in the office for a handful of days (a total of seven) between the start of her FMLA leave in March and mid-July. See [102, ¶ 12]. On July 12, 2016, Plaintiff underwent ileostomy surgery which removed the tumor and a portion of her colon, leaving her with an ostomy bag. [102, ¶ 13.] Plaintiff's doctor expected that September 6, 2016 would have been a reasonable estimated time to return. [*Id.*] Defendants were generally aware that the recuperation period could have been much longer, and openly contemplated that she may not be back until December 2016. [102, ¶ 11.]

While all of this was happening, Stathakis realized that Plaintiff's FMLA leave would expire before her July surgery. [93, ¶ 29.] Defendants' insurance rep, Robin Gallagher, informed Stathakis that because Defendants had a self-funded insurance plan that they had to be careful to

---

[5] Plaintiff insinuated throughout her brief that Stathakis's promises imposed some form of legal liability upon Defendants but does not cite any legal authority in support of that proposition; to the contrary, she concedes that her employment relationship was at-will. In any event, Plaintiff does not appear to be pursuing any breach of contract theories under Illinois law. See *Van Pelt v. Bona-Dent, Inc.*, 2018 WL 2238788, at *3–4 (N.D. Ill. May 16, 2018).

follow the laws regarding FMLA and COBRA.[6] [93, ¶ 30.] Stathakis, Gallagher, and MacKinnon then had an extended email exchange, where Gallagher explained that Defendants could put Plaintiff on COBRA and subsidize her plan. [84-2 at 300–01.] The three had a phone call, following which Stathakis sent the following summary email (the "termination email"):

> Robin,
>
> I want to ensure that we are all clear on what will happen:
>
> - Mary Jo will be put on COBRA effective July 1, 2016. She will be responsible for paying her monthly health insurance premiums.
>
> - The company will continue paying Mary Jo her salary.
>
> - The company will subsidize Mary Jo to the previously-paid Company portion of her health insurance premium (i.e. $300/month).
>
> - We will set a deadline (likely December 31/16) on when we will end paying Mary Jo her salary. When we reach that date, she will be terminated and she will be responsible to pay her health insurance premiums.
>
> Is this acceptable?

[*Id.*] The parties, obviously, vigorously dispute the meaning and legal significance of the fourth bullet point. See [93, ¶¶ 31–32]; [102, ¶ 11.] Regardless, Plaintiff was, indeed, placed on COBRA. [93, ¶ 31.] Defendants gratuitously covered the additional COBRA premiums. [*Id.*, ¶ 33.]

Other health insurance options also came into play around that time. Plaintiff was due to turn 65 in September 2016, making her Medicare eligible. *E.g.* [102, ¶ 15.] Gallagher informed Stathakis that if Plaintiff were to remain off work after August 31, 2016, then COBRA would become Plaintiff's secondary health care insurer and that Medicare would become Plaintiff's primary insurance. [93, ¶ 36]; [84-2 at 82–83]. Gallagher and Stathakis were under the impression

---

[6] The Court does not vouch for the parties' recitation of the rules and regulations regarding employer-provided health insurance. Rather, their beliefs are merely provided as background for the decision-making leading up to Plaintiff's termination.

that Plaintiff's COBRA health benefits would then be in jeopardy if Plaintiff did not sign up for Medicare prior to September 1, 2016. [*Id.*] Plaintiff met with Stathakis on August 1 to talk about her employment and benefits statuses. [102, ¶ 16.] Plaintiff claims that Stathakis tried to convince her to go part time; told Plaintiff that her insurance claims were too expensive; and pressured and threatened her to go on Medicare—feeling threatened, she said she would investigate Medicare. [*Id.*] Defendants, however, dispute that characterization, and instead point to Stathakis's testimony where he denied threatening Plaintiff or telling her that her claims were expensive and instead claimed to have been concerned that Plaintiff's health-care coverage would lapse if she continued to miss work and get moved to part-time status. [*Id.*] Following the meeting, Stathakis put Plaintiff in touch with an insurance rep that specialized in Medicare. Plaintiff exchanged emails with the rep, and Stathakis asked Plaintiff about her decision multiple times. [102, ¶¶ 17–20.] At some point Plaintiff decided not to enroll in Medicare. [93, ¶ 40.]

Plaintiff returned to work, ostensibly full time, a week later, on August 8. [93, ¶ 39.] Plaintiff was paid her entire salary for the 28 days between the expiration of her FMLA leave and her return to work. [*Id.*, ¶ 33.] Upon her return, Stathakis' attitude toward Plaintiff changed to become cold and unfriendly. She felt isolated and scrutinized in the office, and often was driven to tears (outside of the office). [102, ¶ 20.] She also continued to miss time—and this time, she went uncompensated for her days off. [93, ¶ 41.] Plaintiff was hospitalized in October for another health-related issue and subsequently emailed Stathakis asking (a) to work part-time for a full salary and (b) for a $6000 loan to purchase a computer and pay for some of the transition costs associated with going on Medicare. [*Id.* at ¶ 42.] Stathakis responded that Defendants could not provide her with a loan or take her back on anything but a full-time basis. [84-2 at 319.] Stathakis also questioned some of Plaintiff's sick days and explained that her "current schedule of

consistently missing days is not working." [*Id.*] He asked her if she needed "a particular schedule, or other accommodation, that would allow [her] to do the job." [*Id.*] He attached an ADA accommodation form to the email, explaining that she "and [her] doctor need to fill [it] out regarding what [she] need[s] in terms of an accommodation," and return it to an HR rep copied on the email. [*Id.*] Stathakis followed up later that day to ask again if there were "any special accommodations that would be necessary in order for [Plaintiff] to be at work on a full-time basis." [*Id.* at 330.] Plaintiff explained that she needed to take off one day a month for chemotherapy infusions. [*Id.* at 329.] Defendants allowed Plaintiff to work a modified schedule, taking scheduled absences for chemotherapy and physical therapy and making up the time later. [93, ¶¶ 45–46]; [102, ¶ 26.]

Notwithstanding this workaround, Defendants claim to have been displeased with Plaintiff's work. MacKinnon testified that she regularly submitted months-end reports late during her entire tenure, but especially through October and November 2016. [93, ¶ 21.] MacKinnon also testified that she made errors in filling out some of her accounting entries or onboarding new hires. [*Id.*] One of Plaintiff's fellow accountants, Jean Stoll, also testified that she identified errors in Plaintiff's work and emailed her about them. [*Id.*, ¶ 22.] Plaintiff, however, contends that some of the deadlines were soft, and she was assured that she could turn some work in a little late; she was never told of her that her performance was not meeting expectations; the errors were not her fault; or in the alternative any errors were due to poor training or instruction. [102, ¶¶ 33–37.]

In total, outside of the Fridays Plaintiff missed due to her chemotherapy, Plaintiff missed 25 additional days between August 8 and her December 27 termination. [93, ¶ 47.] Although Plaintiff claims to have been able to complete "some of her duties" from home during these absences, Defendants often had to ask other employees to fill in for Plaintiff. [93, ¶ 48.] Plaintiff

missed at least ten consecutive workdays in mid-December, which is a busy time of year due to year-end reports and filings. [93, ¶ 50]; see also [84-2 at 260.] When Plaintiff again missed work on December 27, 2016, MacKinnon called her to terminate her employment. [93, ¶¶ 51–52.]

Plaintiff subsequently sued Defendants on several employment discrimination grounds. The operative complaint [44] lists eight claims: (1) discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") [*id.*, ¶¶ 69–84]; (2) harassment in violation of the ADA [*id.*, ¶¶ 85–98]; (3) retaliation in violation of the ADA [*id.*, ¶¶ 99–116]; (4) discrimination in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA") [*id.*, ¶¶ 117–38]; (5) harassment in violation of the ADEA [*id.*, ¶¶ 139–63]; (6) retaliation in violation of the ADEA [*id.*, ¶¶ 164–89]; (7) willful disregard for the ADEA [*id.*, ¶¶ 190–215]; and (8) retaliation in violation of the FMLA [*id.*, 216–25.] Defendants have moved for summary judgment [82] on all counts.

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, the Court will not draw inferences that are "supported by only speculation or conjecture," *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)) (internal citations omitted), and "[c]onclusory allegations alone cannot defeat a motion for summary judgment."

*Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The

party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex*, 477 U.S. at 323. The Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

### III.    Analysis

Plaintiff brings a bevy of claims under the FMLA, ADA, and ADEA. Many of Plaintiff's claim allege some aspect of discrimination. "[T]he singular question that matters in a discrimination case is: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). The court must "assess the evidence 'as a whole, rather than asking whether any particular piece of evidence proves the case by itself.'" *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quoting *Ortiz*, 834 F.3d at 765). Under the *Ortiz* framework, summary judgment is inappropriate if a reasonable finder could find "either a causal connection between [Plaintiff's activity or status] and the adverse action he suffered or else support an inference of retaliatory [or discriminatory] motive." *McDaniel*, 940 F.3d at 371 (quoting *Lewis v. Wilkie*, 909 F.3d 858, 871 (7th Cir. 2018)).

A plaintiff may also proceed under the *McDonnell Douglas* burden-shifting framework. See generally *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under this approach, the plaintiff must show evidence that '(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more

favorably.'" *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quoting *Carson v. Lake County, Ind.*, 865 F.3d 526, 533 (7th Cir. 2017)). "If the plaintiff meets each element of her prima facie case, 'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id*. at 719–20 (quoting *Carson*, 865 F.3d at 533).

With all this in mind, the Court addresses each of Plaintiff's claims, beginning with the FMLA, and then moving on to the ADEA and ADA. To be clear, the questions before the Court are not whether Plaintiff's illness was tragic—of course it was. Rather, the Court must determine whether there is enough evidence in the record from which a reasonable factfinder could conclude that Defendants illegally harassed, discriminated against, or retaliated against Plaintiff. For the reasons set forth below, the Court finds that there is not.

### A. FMLA Retaliation

Plaintiff claims that she was retaliated against, in response to her exercising her statutory right to FMLA leave.[7] This claim can survive summary judgment if a reasonable factfinder, viewing the evidence as a whole, could infer animus or find a causal connection between her leave and termination. *McDaniel*, 940 F.3d at 371 (quoting *Lewis*, 909 F.3d at 871). She points to the supposed smoking gun evidence of the "termination" email and argues that this shows that (contemporaneous with her leave) Defendants were considering firing her. But the Court must "assess the evidence 'as a whole,'" *id.* at 368 (quoting *Ortiz*, 834 F.3d at 765), and cannot view a single line in one email in complete isolation. Indeed, the rest of the email explained that

---

[7] Plaintiff does not make any argument here under *McDonnell Douglas*. As explained below, *infra* Section III(B)(1), Plaintiff cannot make out the prima facie case because she was not meeting her employer's legitimate expectations.

Defendants sought to *reward* and *incentivize* Plaintiff's taking of leave. And Plaintiff does not dispute that Defendants, in fact, did so. Defendants gratuitously: (1) kept Plaintiff on the payroll for the entirety of her FMLA leave; (2) kept Plaintiff on the payroll for months after her FMLA expired, even though she was not working; and (3) covered Plaintiff's marginal COBRA costs. No reasonable jury could infer retaliatory animus or causation from these facts, which, even when taken in the light most favorable to Plaintiff suggest just the opposite.[8] *McDaniel*, 940 F.3d at 368. Moreover, Plaintiff was fired nine months after she requested FMLA leave and almost two years after she began missing work for health reasons. Although her termination followed her taking leave, such a long passage of time is not suggestive of retaliation. *Davidson v. Midelfort Clinic, Ltd.*, 113 F.3d 499, 511 (7th Cir. 1998) (reviewing cases and concluding when several months elapse between events, "the order in which the events occurred does not by itself suggest a causal link between them.") Defendants are entitled to summary judgment on this count.

### B. ADEA Claims

The ADEA prohibits discrimination based on age. Plaintiff claims that she was discriminated against based on her age, retaliated against, and harassed. Each claim is addressed in turn.[9]

#### 1. Discrimination

People over forty years of age are considered part of the protected class, and better treatment of a comparator who is "substantially younger" satisfies the similarly situated prong of

---

[8] The Court is mindful that it must not *weigh* evidence at summary judgment. *E.g.*, *Bilinsky v. American Airlines, Inc.*, 928 F.3d 565, 572 (7th Cir. 2019). The Court did not do so here. Rather, the inference that Plaintiff was fired for taking FMLA leave is unreasonable considering Defendants unquestionably went above and beyond their statutory duties in providing Plaintiff with *additional* leave and gratuitously paying her tens of thousands of dollars. [92-1 at 26.]

[9] Because the Court concludes that all of Plaintiff's ADEA claims fall, it need not address whether Plaintiff has adduced sufficient evidence of "willfulness."

*McDonnell Douglas.* See, e.g., *Tubergen v. St. Vincent Hosp. and Health Care Center, Inc.*, 517 F.3d 470, 475 (7th Cir. 2008); *see also Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997) ("[W]e consider a ten-year difference in ages * * * to be presumptively 'substantial.'"). Here, Plaintiff cannot proceed with *McDonnell Douglas* burden-shifting because she was not meeting her employer's legitimate expectations.

"[A]t [the] prima facie stage, [the] relevant question is not whether employee satisfied employer's legitimate employment expectations 'in the subjective sense' but rather 'whether the employee is able to put on objective evidence that he is sufficiently competent to satisfy the legitimate expectations of an employer.'" *McKinney v. Office of Sheriff of Whitley County*, 866 F.3d 803, 813 (7th Cir. 2017) (quoting *Pilditch v. Board of Education of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993)). "[T]he critical inquiry is her 'performance at *the time of* [her] termination." *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 753 (7th Cir. 2006) (quoting *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005)) (affirming summary judgment in favor of employer where plaintiff submitted stale performance reviews and could not show that she completed her work on time or accurately).

Here, Plaintiff has not put on objective evidence of her competence at the time of termination. She does not dispute that her attendance was, at best, spotty and unpredictable after her return to work.[10] "It should not require saying that generally attendance is a requirement of a job." *Waggoner v. Olin Corp.*, 169 F.3d 481, 483 (7th Cir. 1999). The Seventh Circuit therefore has consistently held that employees who violate their employer's attendance guidelines are not

---

[10] Plaintiff argues that she was the subject of a "bait and switch" because Defendants first told her that they would pay her through the rest of the year and then fired her for not coming to work. Regardless of whether or not the promise was made, Plaintiff has not raised any argument suggesting why it should be legally binding or actionable under federal civil rights law. Moreover, Plaintiff became aware that her spotty attendance was failing to meet expectations no later than October 23, 2016, two months before she was fired, when Stathakis informed her that her erratic schedule was "not working." [93, ¶ 43]; [84-2 at 319.]

meeting their employer's legitimate expectations. See, *e.g.*, *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014). Even though Plaintiff was warned that her "current schedule of consistently missing days is not working," [84-2 at 319], she failed to conform her behavior to her bosses' expectations. It is Plaintiff's burden to meet the prima facie case, and she has not submitted any objective evidence or caselaw suggesting that she met her employer's legitimate expectations regarding attendance and hours worked. To the contrary, her only evidence are her own statements that she "completed *some of her duties* by working from home and by working extra hours on the days she was in the office." [93, ¶ 48 (emphasis added).] That is, although (1) Defendants' employment policies explained that regular and punctual attendance was required and (2) Stathakis explained to her that notwithstanding her telework, her irregular attendance was "not working," she missed weeks and weeks of work after she had maxed out her PTO, including at least 10 consecutive days during the accounting department's busy season. No reasonable jury could think she met Defendants' legitimate expectations, and she thus cannot proceed with the *McDonnell Douglas* burden shifting framework. *E.g.*, *Moore v. CN Transportation Limited*, 2019 WL 7290727, at *10–11 (N.D. Ill. Dec. 30, 2019) (granting summary judgment when plaintiff missed less than one work week over the course of three months).

Plaintiff's arguments to the contrary are unconvincing. She sidesteps the attendance issue and instead argues that late submissions were tolerated in the office and the sloppy errors were probably someone else's fault. It is true that if Plaintiff had been "singled out" for a minor infraction she may still be able to make out the prima facie case, but it is nonetheless her to burden to put forward some evidence that her performance was otherwise up to snuff. See *Sabet v. City of North Chicago*, 2020 WL 832360, at *11 (N.D. Ill. Feb. 20, 2020) (denying employer's motion for summary judgment where Sabet's supervisor at the time of termination called him "a good

police officer" with "excellent" "productivity" and he was subsequently rehired by another police department, although he had been fired for allegedly lying) (citations omitted); see also *McKinney*, 866 F.3d at 810–13 (disregarding defendants' inconsistent and shifting explanations for termination because they were facially pretextual and the plaintiff offered evidence of his competence). Even assuming that Plaintiff had been singled out for sloppy work, turned in late, that was otherwise tolerated, she has not shown that her *erratic attendance* met her employer's legitimate work expectations, especially in light of the fact that she was warned that this aspect of her performance was falling short. *Moore*, 2019 WL 7290727, at *10–11; see also *Thomas v. City of Chicago*, 2010 WL 380695, at *9 (N.D. Ill. Jan. 28, 2010) (granting summary judgment to employer when plaintiff was informed of concerns and failed to improve).

Plaintiff attempts to counter this conclusion by pointing to two other employees, Janet Ortega and Cathy Lista, who were not fired after taking long leaves of absence, which would suggest that she was, in fact, singled out because of her age. [91 at 10]. This argument misses the mark for several reasons. First, it does nothing to show that intermittent attendance is within the bandwidth of acceptable employee behavior, especially considering Stathakis's warning that her attendance pattern was "not working." *Waggoner*, 169 F.3d at 483. Even if she had shown that irregular and unpredictable attendance was arguably acceptable, Plaintiff has still not shown that she was "singled out for discipline *based on a prohibited factor*," *Ismail v. Brennan*, 654 Fed. Appx. 240, 243 (7th Cir. 2016) (quoting *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001)) (emphasis added), given that there was no indication that Plaintiff was selected for termination based on her age. [93 at 23, ¶ 55 (Lista was over 60 years old)]; see also [102 at 16, ¶ 28 (discussing Ortega, but not disclosing her age)]; *Wrolstad v. Cuna Mutual Insurance Society*, 911 F.3d 450, 455 (7th Cir. 2018) (quoting *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 389 (7th Cir.

15

2012)) ("As the party opposing summary judgment, it [is Plaintiff's] responsibility to 'inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'"). And Plaintiff's conduct (repeatedly assuring her supervisors she would be back to work, then not coming in) is different than that of Lista or Ortega, who did not induce reliance.

Plaintiff's discrimination claim also fails the holistic approach laid out in *Ortiz*. There is no evidence from which a fact-finder could reasonably make out aged-based animus or a causal connection between Plaintiff's age and her termination. Indeed, Plaintiff herself complains that Cathy Lista, who is over sixty years old, and Jean Stoll, who was at least 62, were kept on, while she was terminated. [91 at 19 n.6 (incorporating the discussion of Lista and Stoll).] The fact that Defendants gave two other sexagenarians preferential treatment is simply not enough to support the inference that this was age-based discrimination. *Cf. Hartley*, 124 F.3d at 893.[11] Likewise, age-based animus cannot be inferred from the "termination" email. Even if the email suggested premeditation, which the Court doubts[12], the email has literally nothing to do with her age. Moreover, the email was sent months before the topic of Medicare had been broached with Plaintiff, and even further out ahead of when she ultimately declined to switch to Medicare. Indeed,

---

[11] To be clear, the Court is not attempting to draw the "common actor inference" that Defendants cannot possibly discriminate on the basis of age given that they treat other people in the same protected class well. See, *e.g.*, *McKinney*, 866 F.3d at 814–15 (collecting cases and explaining that evidence in support of the inference may be presented to the jury, but cannot be used to grant summary judgment). Here, the Court simply notes that no reasonable factfinder could infer that Plaintiff's treatment, *as compared to that of other class members*, could give rise to the inference that she was targeted for discrimination based on her status as a class member.

[12] As explained above, any reading of the "termination" email that ascribes nefarious motives to Stathakis is substantially undercut by Stathakis's contemporaneous and subsequent conduct—gratuitously paying Plaintiff's salary during and following her FMLA leave, and paying part of her COBRA health costs while she was out. Moreover, the email was sent in the context of a conversation about "need[ing] to set a date on when the paid leave will end." [84-2 at 295.] Regardless, although Plaintiff's interpretation is tortured, the Court must view the email in the light most favorable to Plaintiff and therefore assumes it shows some premeditated desire to fire Plaintiff regardless of whether she returned to work.

the email thread regarding her insurance options does not even discuss the possibility that she would go on Medicare or anything else to do with her age, and thus is not evidence that could support an inference of animus. Any attempt to connect the email and Plaintiff's age is "speculation" that "may not be used to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

The other argument that Plaintiff raises in defense of her ADEA discrimination claim is that Defendants had a discontinuous preference for employees under 65 years of age for health insurance reasons. Plaintiff's argument is not easy to follow, but as the Court understands it, Plaintiff claims that she was fired when she turned 65 and refused to switch her plan over to Medicare. But the inference regarding Defendants' preferences should go the other way—they should have a discontinuous preference for employees *over* 65 years of age, because they will be less likely to opt into the employee health program (in favor of Medicare). And the problem Plaintiff posed from a cost perspective was not that she was 65 years old (as opposed to 64 and 11 months); rather, the problem was that she had an extremely serious disease that required multiple costly interventions. This observation further negates any anti-senior animus that can be attributed to the "termination email"—if anything, the fact that Plaintiff was soon Medicare eligible would have weighed *against* firing her for health insurance reasons, given that Defendants did not yet know that she would turn down Medicare.

Plaintiff goes on to try to analogize this case to *Carson v. Lake County, Indiana*, 865 F.3d 526 (7th Cir. 2017). The background to *Carson* is complicated, but briefly, the employer offered early retirement to its Medicare-eligible employees during the Great Recession as a cost-saving move; the employer then put the retirees on its supplemental health insurance policy for retirees and rehired some of them part-time. *Id.* at 530. It turns out that this arrangement—putting part-

time employees on the retiree plan—violates federal law, so the employer promptly fired all the affected employee/retirees. *Id.* at 530–31. The Seventh Circuit held that although all of the fired employees were definitionally over 65 years old, age was not a "but for" cause of the termination: the employees were fired "because they were enrolled in a retiree-only insurance plan in which current employees could not participate." *Id.* at 533. Moreover, there was no evidence that the employer had stereotyped the fired part-time employees based on their age. *Id.* at 534 (discussing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611–13 (1993)).

As the Court reads *Carson*, it suggests that Plaintiff's claim should fail as well. Even viewing the evidence in the light most favorable to Plaintiff, her argument is not that she was fired when she hit Medicare eligibility, it's that she was fired when she refused to change her health plans. Thus, although turning 65 was a condition precedent, it was not a but-for cause of her termination.[13] See *Carson*, 865 F.3d at 533. And the mere fact that Plaintiff was fired four to five months after she refused to switch to Medicare, see [91 at 17–18 (recounting this timeline in reference to the ADEA claim)], does nothing to shore up her claim. See *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) ("Even intervals shorter than four months are unlikely, standing alone, to establish the causation element of a retaliation claim.") Finally, as discussed above, Defendants' gratuitous payments during and following FMLA leave, along with their taking care of her medical costs, strongly negate any inference of animus attaching to her termination. Thus, even viewing the evidence in the light most favorable to Plaintiff, Defendants are entitled to judgment as a matter of law on her ADA discrimination claim.

---

[13] The question of whether an employer may lawfully fire an employee for selecting the wrong kind of healthcare or otherwise having high healthcare costs is not before the Court. "As the party opposing summary judgment, it [is Plaintiff's] responsibility to 'inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Wrolstad*, 911 F.3d at 455 (quoting *Milligan.*, 686 F.3d at 389. Because Plaintiff has not done so, the Court will not wade further into this issue.

### 2.    Retaliation

Plaintiff does not defend her ADEA retaliation claim in her response, and therefore waives the claim. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *see also Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018) (plaintiffs cannot "leav[e] it up to the district court to surmise which facts supported which claim and how those facts operated to defeat summary judgment as to each claim.") In any event, "[t]o survive summary judgment on a timely retaliation claim, 'plaintiff must offer evidence of [] a statutorily protected activity;' * * * . *Skiba*, 884 F.3d at 718 (quoting *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). Because Plaintiff has offered no evidence or argument suggesting she engaged in a statutorily protected activity, her ADEA retaliation claim fails. *M.G. Skinner*, 845 F.3d at 321. And to the extent that she sought her retaliation claim to mirror the discrimination claim discussed above, it fails for the same reasons.

### 3.    Harassment

To succeed on hostile environment claim, a plaintiff must demonstrate that: "(1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe *or* pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (emphasis added). It is not clear that Plaintiff can defeat summary judgment on any element of this claim, but the most straightforward here is the third prong—whether the age-based harassment altered the conditions of employment and created an abusive work environment.

"Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012). Although the work "environment need not reach the point of 'hellishness'" to be actionable, employees are expected to maintain a "thick skin." *Johnson*, 892 F.3d at 900–01 (citations omitted). Relevant factors include "'the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employee's work performance.'" *Gates v. Board of Education of the City of Chicago*, 916 F.3d 631, 637 (7th Cir. 2019) (quoting *Robinson*, 894 F.3d at 828). In analyzing this prong, some cases look "instead for evidence that the workplace was both subjectively and objectively offensive," but in the end "the inquiry is the same." *Johnson*, 892 F.3d at 900. Importantly, the harassment need not be both severe and pervasive—one or the other will suffice. *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). Harassment from ones' supervisors is more severe than that from one's peers. *Gates*, 916 F.3d at 638–41 (7th Cir. 2019) (collecting cases).

Here, Plaintiff sums up the complained of conduct as follows: "harassment took the form of [1] Stathakis' repeated questions concerning her Medicare status, [2] Defendants' cold and unfriendly attitude, and Defendants' abrupt transition from support and concern to isolation and scrutiny created by Defendants' [3a] demand for doctor's notes and [3b] refusal to honor the promise of regular salary through the end of 2016." [91 at 20].

First, even viewing the evidence in the light most favorable to Plaintiff, Stathakis only asked about Medicare "multiple times," which is hardly severe or pervasive harassment. Likewise with the cold attitude, which Plaintiff described elsewhere as "strictly business" and "professional." [93, ¶ 57.] Even if Stathakis had acted "boorishly" or yelled at Plaintiff on the

multiple times that they discussed Medicare, it would not be severe enough to give rise to hostile environment; *a fortiori*, this does not even come close. *Mercer v. Cook County, Ill.*, 527 Fed. Appx. 515, 521 (7th Cir. 2013) ("boorish or offensive" remarks not actionable); *Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008) (being "badgered [] in a loud, unprofessional tone" not actionable); *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (supervisor's questions about plaintiff's bras, sexual innuendo, and attempt to remove plaintiff's tank top to view her bra not actionable). Regarding the doctor's notes, it is unclear how such a requirement is harassment, let alone severe or pervasive. Finally, and most obviously, the allegation that Defendants' gratuitously paying her salary for only several months (as opposed to a whole year) was actionable severe harassment is a non-starter. Even if these developments were *subjectively* offensive, as evinced by Plaintiff's being driven to tears, no reasonable jury could think that Defendants' conduct reached the level of objective offensiveness.

### C.     ADA Claims

"The ADA proscribes discrimination against only 'qualified individual[s] with a disability.'" *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996) (citing 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4; 29 C.F.R. app. § 1630.9). "No matter the type of discrimination alleged—either disparate treatment or failure to provide a reasonable accommodation—a plaintiff must establish first that [she] was 'a qualified individual with a disability.'" *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997) (quoting *Bombard*, 92 F.3d at 563). To be considered qualified, "the individual must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996), (quoting 29 C.F.R. app. § 1630.2(m)). "[Courts] presume that an employer's understanding of the essential

functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) (citing *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001)); see also *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012) (courts must "generally defer to an employer's determination of the essential functions of a job"); *Lloyd v. Swifty Transp. Inc.*, 552 F.3d 594, 601 (7th Cir. 2009) ("The employer, not a court, determines what functions are essential, and we will not second-guess that decision."). That does not mean, however, that a district court may "completely abdicate [its] independent review" of a position's essential functions. *Feldman*, 692 F.3d at 755. Once those essential functions have been determined, however, the plaintiff bears the burden of showing whether she can perform them. *Miller v. Ill. Dep't of Corrs.*, 107 F.3d 484, 484 (7th Cir. 1997).

The Seventh Circuit has "repeatedly held that an employee who does not come to work cannot perform the essential functions of his job." *Fogle v. Ispat Inland, Inc.*, 32 Fed. Appx. 155, 157-58 (7th Cir. 2002); accord *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927-28 (7th Cir. 2001); *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000); *Waggoner*, 169 F.3d at 483. Moreover, "[a]n employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance." *Taylor-Novotny v. Health Alliance Medical Plans, Inc.*, 772 F.3d 478, 489 (7th Cir. 2014) (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013)).[14]

---

[14] Although some judges have suggested that the reasonableness of telework should generally be submitted to the jury, the Seventh Circuit has not adopted that approach. Compare *Bilinsky*, 928 F.3d at 573 (affirming summary judgment when employer stated that in-person presence was essential job duty) with *id.* at 575–76 (Hamilton, J, dissenting) (discussing out of circuit cases that seemingly applied a higher standard for demonstrating that in-person presence is necessary). In any event, this case is quite different from *Bilinsky*. In *Bilinsky*, the plaintiff's disability was that she was extremely sensitive to high heat, which posed a

Indeed, the case at bar is quite similar to *Taylor-Novotny*. In that case, the plaintiff had multiple sclerosis, as a result of which she was perpetually tardy. *Id.* at 483–86. The plaintiff argued, among other things, that she should have been allowed to telecommute, because the company had a policy allowing some employees to do so. *Id.* at 489–90. The Seventh Circuit disagreed, because (a) an employer may treat regular attendance as an essential job requirement, (b) the telecommuting policy still required employees to be accessible during regular hours, which the plaintiff could not do, and (c) the plaintiff could not come up with a reasonable accommodation that would allow her to meet her employer's expectation of regular attendance. *Id.* at 490.

Here, it is undisputed that the employee handbook requires punctual, in-person attendance every day. [84-2 at 216 ("Should undue tardiness or absenteeism become apparent (three or more times within one calendar year), disciplinary action up to and including discharge may be required.")] Although neither party has pointed the court to a job description, Plaintiff's immediate supervisor testified that many aspects of her job required in-person attendance, including cutting checks, mailing documents, accessing hard copies, and interfacing with other departments in real time. See [102-1 at 32]; see also *Bilinsky*, 928 F.3d at 573 ("The position's nature will often require face-to-face collaboration.") (citing *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948 (7th Cir. 2001) (en banc)). Also, Plaintiff's supervisors explained to her that her "current schedule of consistently missing days is not working." [84-2 at 319.] And Plaintiff does not dispute that her

---

problem given that the company she worked for was headquartered in Dallas, TX. She worked out a compromise with her employer that she would generally work remotely from the frigid steppe of Chicago, IL and "travel[] to Dallas one day per week to meet with colleagues and perform tasks that required a physical presence." *Id.* at 567. At some point, her employer unilaterally changed its policy and, although her supervisor "expressed no complaints about Bilinsky's performance," she was fired when she refused to relocate. *Id* at 568. Even on those facts, the Seventh Circuit concluded that in-person attendance was mandatory. *Id.* at 573. As discussed below, Plaintiff not only wanted to work from home, she wanted her "erratic or unreliable attendance" excused, which seemingly everyone agrees is presumptively a bridge too far. See *id.* at 574 (Hamilton, J., dissenting) (approvingly quoting *Taylor-Novotny*'s affirmance of summary judgment on employer's behalf).

attendance was erratic. *E.g.*, [*id.*]; [93, ¶ 50.] Simply put, Plaintiff has pointed to no evidence to rebut the presumptions that in-person and regular attendance were essential job functions. Likewise, Plaintiff has not even suggested any accommodations that would have allowed her to meet the essential function of regular attendance notwithstanding her disability. *Taylor-Novotny*, 714 F.3d at 490 (explaining that telework is not an accommodation for people who cannot commit to regular hours). Accordingly, all the ADA claims—harassment, retaliation, and discrimination— fail as a matter of law.[15]

---

[15] Even if Plaintiff was covered by the ADA, her claims would all fail. As with the ADEA retaliation claim, she does not defend it, and therefore waives it. See supra Section III(B)(2). Her harassment claim is based on the same facts as the ADEA harassment claims (being asked questions and subject to a professional atmosphere) and is therefore neither severe nor pervasive. See supra Section III(B)(3). And her discrimination claims fail as well. Her wrongful termination theory cannot be proved under the *McDonnell Douglas* framework, because she was not meeting her employer's legitimate job expectations. See supra Section III(B)(1). The case here is even easier, because she also cannot point to a similarly situated comparator who engaged in similar conduct (missing months of work after exhausting her available FMLA leave) and was not part of the protected class. See [91 at 7–9 (sidestepping attendance, except to compare Plaintiff to two other employees who took extended medical leave).] Plaintiff, likewise, cannot proceed under *Ortiz*, because it is impossible to draw the inference that the "termination email" evinced anti-disability animus given that it was sent one month before Plaintiff's surgery and two months before she returned to work and the extent of her disability became known. Finally, Plaintiff's reasonable accommodation theory also fails, because she failed to participate in the "informal, interactive process" required by the ADA. See, *e.g.*, *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005) (quoting 29 C.F.R. § 1630.2(*o*)(3)). The employer has the initial burden of exploring available accommodations. *Id.* But, "when an employer takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate or withholds essential information." *Sansone v. Brennan*, 917 F.3d 975, 980 (7th Cir. 2019) (quoting *E.E.O.C. v. Sears, Roebuck, & Co.*, 417 F.3d 789, 806 (7th Cir. 2005)). Here, it is undisputed that Stathakis repeatedly asked Plaintiff to let him know if she needed any accommodation beyond taking one day a month off (which he provided). He also undisputedly told Plaintiff to talk to her doctor and provided her with an accommodation form. Plaintiff does not offer any evidence to suggest that Stathakis's emails were sent in bad faith or that he was otherwise inactive—and she concedes that she did not follow up with her doctor, HR, or Stathakis to work something out. Accordingly, Plaintiff's reasonable accommodation claim would fail as well. *Id.*; *Jackson*, 414 F.3d at 814 (affirming summary judgment when Plaintiff was responsible or breakdown of interactive process because she responded to employer's requests for information with conclusory and circular demands).

## IV.     Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [82] is granted. A separate Rule 58 judgment will be entered in favor of Defendants and against Plaintiff. Civil case terminated.

Dated: March 6, 2020

_____
Robert M. Dow, Jr.
United States District Judge

25